UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:18-cv-61234

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

ISAAC GROSSMAN, DRAGON-CLICK CORP.,
ADRIANA GROSSMAN, and
DRAGON MANAGEMENT, LLC,

Defendants.
_____/

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION TO SET
DISGORGEMENT, PREJUDGMENT, AND CIVIL PENALTY AMOUNTS AND FOR
ENTRY OF FINAL JUDGMENT AGAINST ALL DEFENDANTS**

## I. INTRODUCTION

Defendants Isaac Grossman ("Grossman"), his company Dragon-Click Corp ("Dragon-Click" or the "Company"), and Adriana Grossman ("A. Grossman") and her company Dragon Management LLC ("Dragon Management") executed consents to judgments imposing injunctions and disgorgement with prejudgment interest and civil money penalties in amounts to be determined by this Court (DE 24). Accordingly, and as set forth in the Court's Judgment against the Defendants, the only remaining issue in this case is the amount each Defendant will be ordered to pay (DE 26). For the reasons discussed below, the Court should enter a Final Judgment against the Defendants ordering them to pay as follows:

- Defendant Isaac Grossman: joint and several liability with Dragon-Click for paying disgorgement of $1,019,000 (representing the amount Grossman misappropriated from the $1.6 million Dragon-Click received from investors), prejudgment interest of $12,842.19, and a civil penalty of $160,000.

- Defendant Adriana Grossman: disgorgement of $293,000 (representing the amount she misappropriated from investors), prejudgment interest of $3,692.60, and a civil penalty of $160,000.

1

- Defendant Dragon-Click: disgorgement of $1.6 million (representing the amount of investor funds Dragon-Click received), prejudgment interest of $20,164.38, and a civil penalty of $775,000.

- Defendant Dragon Management: $547,000 (representing the amount of investor funds Dragon Management received), prejudgment interest of $6,893.70, and a civil penalty of $775,000.

## II. <u>PROCEDURAL HISTORY</u>

On June 4, 2018, the Commission filed its Complaint against the Defendants for engaging in securities fraud in violation of Section 17(a) of the Securities Act of 1933 and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, together with an *ex parte* emergency motion for a temporary restraining order and other relief. (DE 1, 3 & 4). On June 5, the Court granted the emergency motion and imposes a temporary restraining order and asset freeze against the Defendants. (DE 7 & 8). On June 12, the Court set a hearing on its Order to Show Cause why a preliminary injunction should not be issued. (DE 16). On June 15, the Commission filed the executed Consents of each Defendant, in which they agreed to judgments imposing preliminary injunctions against them. (DE 17). The Court entered preliminary injunctions against each Defendant. (DE 19).

The Defendants failed to respond to the Complaint and accordingly, the Court, upon a *sua sponte* examination of the record, directed them to respond to the Complaint by no later than July 5, 2018. (DE 20). The Defendants failed to respond to the Complaint, and the Commission filed a motion for a clerk's entry of default against them. (DE 21). On July 13, a Clerk's entry of default was entered as to each Defendant. (DE 22). The Defendants subsequently executed Consents agreeing to the entry of Consent Judgments against them. Accordingly, on July 27, the Commission filed a motion to set aside the Clerk's entry of default and to enter the Consent Judgments. (DE 24).

On July 30, the Court granted the Commission's motion to set aside the default judgments and enter the Consent Judgments. (DE 25 & 26). The Consent Judgments imposed permanent injunctions against each Defendant, as well as disgorgement, prejudgment interest, and civil money penalties. (DE 26). Pursuant to the Consent Judgments, the Court will decide the amount of disgorgement, prejudgment interest, and civil penalties upon the Commission's motion, and the Complaint allegations are deemed true for purposes of determining the amounts each Defendant will pay. *Id.*

### III.  COMPLAINT ALLEGATIONS WHICH THE DEFENDANTS HAVE AGREED ARE DEEMED AS TRUE FOR PURPOSES OF DETERMINING THE AMOUNTS THEY WILL PAY

As set forth in the Consents and Consent Judgments, the following allegations are deemed true for purposes of determining the amounts each Defendant will pay:

From no later than September 2014 until present, the Defendants have participated in the offer or sale of securities in the form of Dragon-Click stock and Dragon Partners, LLC ("Dragon Partners") membership interests. (Compl. ¶2).  Grossman tells investors Dragon-Click is in the business of creating an internet application that locates retailers and provides price-comparisons for any item for which a shopper uploads a photograph (the "Dragon Click Application"). *Id.* at ¶3. Thus far, the Defendants have raised more than $2.4 million from at least 26 investors nationwide, most of them elderly. *Id.* at ¶4. Investor funds continued to be raised until at least April 2018. *Id.* at ¶5.

To lure investors, Grossman knowingly or recklessly materially misrepresents investment returns and how the Defendants will use investor funds. *Id.* at ¶6. For example, Grossman tells potential investors he will double, triple or even quadruple their money by investing it in Dragon-Click stock.  This representation is false.  At the same time Grossman has been making these promises, he has been spending the vast majority of investor money to fund his personal expenditures. *Id.* at ¶7.  Similarly, Grossman tells potential investors he will use their money to pay for the development and marketing of the Dragon-Click Application.  This is false. Grossman and his wife, Adriana Grossman, have been misusing or misappropriating investor funds to pay their personal living expenses and to fund their lifestyle, which includes funding Grossman's gambling habits as well as the purchase of luxury vehicles and jewelry. *Id.* at ¶8.

Grossman and A. Grossman have spent the majority of investor funds for their own personal use to the tune of at least $1.3 million. *Id.* at ¶9.  Through their conduct, the Defendants have violated the anti-fraud provisions of the federal securities laws.  *Id.* at ¶10.

### A.  Defendants and Related Entity

**Isaac Grossman** entered the securities industry in 1997 and worked at numerous broker-dealers in various capacities until November 2012, when the Financial Industry Regulatory Authority ("FINRA") permanently barred him from acting as a broker or otherwise associating with a broker-dealer firm. *Id.* at ¶12.  In September 2013, the U.S. Commodity Futures Trading Commission ("CFTC") instituted proceedings against Grossman for violations of the Commodity

Exchange Act. *Id.* Grossman consented to an Order, without admitting or denying liability, finding that he and his company, London Metals Market LLC ("London Metals"), engaged in illegal, off-exchange, precious metals transactions (the "CFTC Order"). *Id.* The CFTC Order, entered September 4, 2013, directed Grossman and London Metals to pay $121,665.75 in restitution to their customers, imposed permanent registration and trading bans on Grossman, and required him to cease and desist from violating the Commodity Exchange Act. *Id.* Neither Grossman nor London Metals has paid the restitution the CFTC ordered. *Id.* Grossman is not registered with the SEC in any capacity. *Id.*

**Adriana Grossman** is married to Isaac Grossman and resides with him in Parkland, Florida. *Id.* at ¶13. From September 2014 until June 2016, A. Grossman, without any legitimate basis, spent at least $293,000 of investor funds on her personal expenditures. *Id.*

**Dragon-Click** is a Florida corporation headquartered in Parkland, Florida that Grossman incorporated in July 2014. *Id.* at ¶14. Grossman is its sole officer and director, its Registered Agent, and the sole signatory on the Dragon-Click bank account. *Id.*

**Dragon Management** is a Florida limited liability company headquartered in Deerfield Beach, Florida, that Adriana Grossman organized in June 2014. *Id.* at ¶15. Dragon Management is the manager and investment adviser of Dragon Partners. *Id.* A. Grossman is its only member, its Registered Agent, and the sole signatory on the Dragon Management bank account. *Id.* From March 2015 through at least June 2016, Dragon Management, without any legitimate basis, received approximately $293,000 of investor funds emanating from the Defendants' securities fraud. *Id.*

**Dragon Partners** is a related entity and is a Florida limited liability company headquartered in Deerfield Beach, Florida, that Adriana Grossman formed in June 2014. *Id.* at ¶16. The company was organized to invest in Dragon-Click securities. *Id.* A. Grossman is its Registered Agent and the sole signatory on the company's bank account, and Dragon Management is the company's sole manager. *Id.* From September 2014 through at least April 2016, the company, without any legitimate basis received approximately $547,000 of investor funds emanating from the Defendants' securities fraud. *Id.*

### B. The Dragon-Click Offering

From no later than June 19, 2014 through present, Isaac and Adriana Grossman have, directly or indirectly through the Corporate Defendants they control, participated in the offer or

sale of Dragon-Click stock. *Id.* at ¶20. The terms of the offering are memorialized in a Private Placement Memorandum dated June 19, 2014 (the "PPM") issued by Dragon Partners. *Id.* at ¶21. Isaac Grossman and Adriana Grossman provided input into the language in the PPM and Grossman personally approved the language in the PPM prior to its distribution to potential investors. *Id.* at ¶22.

As set forth in the PPM, Dragon Partners offers investors the opportunity to invest in Dragon Partners, which then acts as an investment fund to purchase Dragon-Click stock for the benefit of investors. *Id.* at ¶23. The PPM tells investors that Adriana Grossman, on behalf of Dragon Management, is the manager of the Dragon Partners fund who will "manage and administer the Fund's investment portfolio." *Id.* at ¶24. According to the PPM, the success of Dragon Partners is dependent on the manager's identification of successful enterprises or innovations in which to invest, and Dragon Management and Adriana Grossman are vested with the sole discretion to make those decisions. *Id.* at ¶25. According to the PPM, the minimum investment is $25,000 for a membership interest in Dragon Partners unless A. Grossman, in her discretion, permits a smaller investment. *Id.* at ¶26.

### C. Solicitation of Investors

From no later than September 2014 until at least April 2018, Dragon-Click, through Isaac Grossman, solicited investor contributions by contacting potential investors nationwide by telephone. *Id.* at ¶27. Grossman has solicited potential investors he located through word-of-mouth, knew during the time when he was in the broker-dealer industry, or knew because they had invested with him previously when, according to the CFTC Order, he was illegally offering investments in London Metals. *Id.* at ¶28. Grossman has solicited many investors more than once, and some investors have purchased more Dragon-Click stock after Grossman has solicited them a second or third time. *Id.* at ¶29. Grossman offers investors shares of Dragon-Click stock for $25 per share. *Id.* at ¶30. Grossman tells potential investors that Dragon-Click has an internet application that is going to revolutionize shopping on the internet, and that the Dragon Click Application will allow a shopper to upload a photograph of the item the shopper wants to purchase and will then locate all retailers offering that product for sale, to allow the shopper to do a price comparison. *Id.* at ¶¶31-32. Grossman promises potential investors that the Dragon-Click technology will generate huge returns for the investors and that their money would be used

to pay for development of the technology, legal fees for the patents, and marketing of the technology. *Id.* at ¶33.

Grossman has solicited at least $2.4 million from at least 26 investors nationwide, most of them elderly. *Id.* at ¶34. Investors have invested these funds in Dragon Partners by contributing investment funds by check or wire transfer. *Id.* at ¶35. Investors send their money via check or wire transfer to one of three bank accounts in the names of Dragon-Click, Dragon Partners, or Dragon Management. *Id.* at ¶36. Adriana Grossman has endorsed the investor checks to Dragon Partners and Dragon Management for deposit into these companies' bank accounts, which she controls. *Id.* at ¶37. Isaac Grossman has endorsed the investor checks to Dragon-Click for deposit into the Dragon-Click bank account, which he controls. *Id.* at ¶38.

As of April 2018, only a total of about $53,000 has been returned to investors. *Id.* at ¶39.

### D. Investment Documents

As part of the solicitation and investment process, Grossman sends investors investment documents via e-mail, facsimile or Federal Express. *Id.* at ¶40. Specifically, when Grossman solicits potential investors, he sends them a Dragon Partners, LLC Subscription Agreement (the "Subscription Agreement") and the PPM. *Id.* at ¶41. After Grossman successfully solicits investors and the Defendants receive their funds, Grossman sends investors a one-page confirmation document reflecting the investor's purchase of a certain number of Dragon-Click shares ("Investment Confirmation"). *Id.* at ¶42.

#### 1. The Dragon Partners Subscription Agreement

The Subscription Agreement defines Dragon Partners as the "Fund" and provides that the investor is buying "Membership Interests in the Fund." *Id.* at ¶43. The Subscription Agreement requires investors to sign representing that, among things, they received and read the PPM and understand the compensation to Adriana Grossman, as fund manager, as set forth in the PPM. *Id.* at ¶44. The Subscription Agreement states that it is binding upon acceptance of the Subscription Agreement by the Dragon Partners manager. *Id.* at ¶45. Upon receipt of the executed Subscription Agreements, Adriana Grossman signed to approve the investments in her capacity as the authorized member of Dragon Management. *Id.* at ¶46.

#### 2. The Dragon Partners PPM

The PPM details the relationship between Dragon Partners and Dragon Management and describes how investor proceeds will be used. *Id.* at ¶47. The PPM states that Dragon Partners

6

was organized to operate as a private pooled investment vehicle for the benefit of investors who seek exposure to stock in Dragon-Click, which intended to go public, be acquired, or merge as the final outcome of the investment.  *Id.* at ¶48.  The PPM further states that the manager and investment adviser of Dragon Partners is Dragon Management, and Adriana Grossman, the principal of Dragon Management, will manage and administer the Fund's investment portfolio. *Id.* at ¶49.  The PPM states that proceeds raised will be used to purchase Dragon-Click stock and to pay Dragon Partners' expenses, including management fees, legal and accounting costs, corporate filing fees and other day-to-day operational expenses.  *Id.* at ¶50.  Pursuant to the PMM, Dragon Management receives a management fee of 2% per year of assets under management.  *Id.* at ¶51.

Additionally, the PPM provides that Dragon Management charges a performance-based fee at a rate of 25%, to be paid at the end of a "Capital Event." *Id.* at ¶52.  In the PPM, "Capital Event" is defined as one of the following: a period after an IPO of Dragon-Click; the sale or merger of Dragon-Click; the sale by the Dragon Partners of any remaining privately-held Dragon-Click shares after the expiration of a one-year sale restriction period under Rule 144; or the sale of all or substantially all of Dragon Partner's assets. *Id.* at ¶53. No Capital Event has ever occurred. *Id.* at ¶54.

### 3.  The Investment Confirmation

After investors send the Defendants their investment contributions, Grossman, through Dragon-Click, provides investors with an Investment Confirmation reflecting the investor's name, the date of the investment, the amount of shares purchased, and the purchase price.  *Id.* at ¶55. According to the Investment Confirmation, investors' funds purchased shares in an entity called "Dragon-Click LLC." *Id.* at ¶56. Dragon-Click LLC does not exist. *Id.* at ¶57.

### E.  Misrepresentations and Omissions in the Securities Offering

In connection with the Dragon Partners offering, the Defendants have knowingly or recklessly made material misrepresentations and omissions about the use of investor funds, investment returns, and Adriana Grossman's compensation. *Id.* at ¶58.

### 1.  Isaac Grossman's Oral Misrepresentations About: (a) The Use Of Investor Funds; And (b) Large Investment Returns

From no later than September 2014 until at least April 2018, Isaac Grossman has made materially false and misleading statements and omissions to investors when he solicits them by

telephone. *Id.* at ¶59.  Grossman has made at least two misrepresentations to investors – namely, that: (a) their investment funds will be used to develop the Dragon Click Application and related patent; and (b) an investment in Dragon-Click stock will produce massive investment returns. *Id.* at ¶60.  For example, in March 2016, Grossman solicited by telephone a male investor with the initials D.H. who is 80 years old and resides in Murfreesboro, Tennessee. *Id.* at ¶61.  During the call, Grossman told D.H. that Dragon-Click would revolutionize shopping on the internet, and that he needed investor funds for the final development of the technology and patents. *Id.* at ¶62.  Based on these representations, on March 18, 2016, D.H. purchased 2,000 shares of Dragon-Click stock for $25 per share, for a total investment of $50,000 via a personal check. *Id.* at ¶63.

In October 2016, Grossman called D.H. to solicit him a second time.  During this call, Grossman told D.H. more money was needed to complete the technology and obtain the patents, and that D.H. would double his money when the patents were sold. *Id.* at ¶64.  Based on these representations, on about October 18, 2016, D.H. purchased 500 additional shares of Dragon-Click stock for $12,500. *Id.* at ¶65.

In February 2018, Grossman called D.H. to solicit him a third time.  During this call, Grossman told D.H. he needed more money to pay the patent attorneys. *Id.* at ¶66. Based on Grossman's representations and the seemingly urgent need to conclude the project in order to receive investment proceeds, D.H. purchased an additional 400 shares of Dragon-Click stock for $10,000 on February 22, 2018. *Id.* at ¶67.

Grossman never told D.H. that investor proceeds would be used for any purpose other than the development of the Dragon-Click Application, patent attorneys, and to market the Dragon-Click product. *Id.* at ¶68.  In reality, Grossman used D.H.'s investor funds for personal expenditures.  For example, of the $10,000 funds D.H. wired on February 22, 2018, Grossman spent more than $5,000 gambling at a casino and used the remaining funds for other personal expenditures. *Id.* at ¶69.

Similarly, in about December 2014, Grossman solicited by telephone a man with the initials P.Z. who is 75 years old and lives in Adel, Iowa. *Id.* at ¶70.  During this call, Grossman told P.Z. that he hoped to sell the Dragon Click Application to Google and that if P.Z. invested he stood to triple or quadruple his investment in less than six months. *Id.* at ¶71.  Based on these representations, on about December 18, 2014, P.Z. purchased 1,000 shares of Dragon Click stock for $25,000.  These funds were deposited into the Dragon Partners bank account. *Id.* at ¶72.

Similarly, in late May or early June 2015, Grossman solicited by telephone a male investor with the initials R.B. who is 79 years old and resides in Broomfield, Colorado. *Id.* at ¶73.  During this call, Grossman told R.B. that if he invested in Dragon-Click he would more than double his money because Dragon-Click would be acquired by a large company such as Google or Amazon for $1 billion or more. *Id.* at ¶74.  Also during this call, Grossman told R.B. that he would use R.B.'s investment funds to complete the Dragon-Click software, pay the patent attorneys' fees, and market the technology. *Id.* at ¶75. Based on these representations, on about June 17, 2015, R.B. purchased 500 shares of Dragon-Click stock for $25 per share, for a total of $12,500.  These funds were deposited into the Dragon Partners bank account. *Id.* at ¶76. Grossman did not use any of the $12,500 R.B. invested in June 2015 to pay patent attorneys' fees or other business expenses as he had promised. *Id.* at ¶77.

In about July or August 2016, Grossman solicited R.B. a second time. *Id.* at ¶78.  During this call, Grossman told R.B. he needed additional money to pay for the last phase of the patent process.On about August 29, 2016, R.B. invested another $12,500 for 500 shares of Dragon-Click stock via wire transfer into the Dragon-Click bank account. *Id.* at ¶79.

Similarly, in May 2015, Grossman solicited by telephone a male investor with the initials R.N. who is 77 years old and resides in Temple, Texas. *Id.* at ¶80.  During this call, Grossman told R.N. that Dragon-Click needed to raise money to pay for the final development of Dragon-Click technology and patents. *Id.* at ¶81. Based on these representations, on about July 20, 2015, R.N. purchased 2,500 shares of Dragon-Click stock for $25 per share, for a total of $62,500. *Id.* at ¶82.

In early 2016, Grossman solicited R.N. a second time.  During this call, Grossman told R.N. more money was needed to complete the technology and obtain the patents.  Grossman promised R.N. he would double his money when the Dragon-Click patents were sold. *Id.* at ¶83. Grossman solicited R.N. by telephone five more times: in May 2016, April 2017, August 2017, December 2017, and January 2018.  *Id.* at ¶84.  During each of these five calls, Grossman told R.N. Dragon-Click needed more money to complete the patent application process and to pay attorneys' fees, that he was very close to completing the sale of Dragon-Click to an unidentified buyer, and that R.N. would be receiving $500,000 after the sale closed. *Id.* at ¶85. Based on Grossman's representations during the May 2016 call, R.N. invested an additional $12,500 on May 12, 2016, to purchase 500 more shares of Dragon-Click stock for $25 per share. *Id.* at ¶86.

Based on Grossman's representations during the April 2017 call, R.N. invested an additional $25,000 via an April 12, 2017 wire transfer to Dragon-Click, to purchase 1,000 more shares of Dragon-Click stock for $25 per share. *Id.* at ¶87. Based on Grossman's representations during the August 2017 call, R.N. invested an additional $150,000 on about August 14, 2017, to purchase 500 more shares of Dragon-Click stock for $25 per share. *Id.* at ¶88.  Based on Grossman's representations during the December 2017 call, R.N. invested an additional $16,000 via a December 18, 2017 wire transfer to Dragon-Click, to purchase more shares of Dragon-Click stock. *Id.* at ¶89. Based on Grossman's representations during the January 2018 call, R.N. invested an additional $5,000 via a January 19, 2018 wire transfer to Dragon-Click, to purchase more shares of Dragon-Click stock, for a total of $271,000. *Id.* at ¶90.

Grossman's promises to investors about investment returns and representations about the use of investor funds are materially false. *Id.* at ¶91.  At the same time Grossman was making these representations to investors, he was spending the majority of investor funds in the Dragon-Click bank account on his personal expenditures and not on Dragon-Click. *Id.* at ¶92. Grossman lacks any personal bank account and has instead used the investor funds in the Dragon-Click bank account to pay his personal expenditures. *Id.* at ¶93. Grossman had no reasonable basis for promising investors massive investment returns based on the success of the Dragon-Click business because he was spending investor money on himself and his family, rather than on developing the business. *Id.* at ¶94.

Contrary to Grossman's representations to investors in 2015 and 2016 that he required funds to pay attorneys' fees, Grossman did not make his first payment for patent attorneys' fees until April 27, 2017, for only $2,400. *Id.* at ¶95. Contrary to Grossman's representations in December 2017 and January 2018 about using investor funds to pay patent attorneys, Grossman has not paid patent attorney fees since August 17, 2017, for $33,100.  *Id.* at ¶96.  This payment and the April 2017 payment of $2,400 are the only funds used by Grossman and the companies to pay patent attorney fees, and he did not pay patent attorneys after August 2017. *Id.*

Additionally, contrary to Grossman's representations that Google and Amazon were potential buyers of Dragon-Click's technology, Grossman has never had any discussion with these companies and there was never any potential deal with them. *Id.* at ¶97.

10

### 2. *Isaac Grossman's Misappropriation of Investor Funds*

Approximately $1.6 million of investor funds was deposited into the Dragon-Click bank account Grossman controls. *Id.* at ¶98. From October 2014 through April 2018, Grossman misappropriated at least $1,019,000 of the $1.6 million of investor funds in the Dragon-Click account, as follows:

| Investor Funds Spent For Personal Use | Items and Services Purchased |
|---|---|
| $426,000 | Gambling, primarily through slot machines and table games, at a casino in Broward County, Florida |
| At least $500,000 | Cash withdrawals for personal use |
| At least $15,000 | Groceries, gas, and food |
| At least $29,000 | Auto lease payments to Manhattan Leasing and GM Financial |
| $6,000 | Jewelry |
| $19,000 | Health and car insurance |
| $12,000 | The Grossman's children's school tuition payments |
| $12,000 | Walmart purchases |

*Id.* at ¶ 99.  At no time did Grossman tell investors he was misappropriating or misusing investor funds for his own personal use. *Id.* at ¶100.  However, the PPM Grossman gave to investors states that no commissions will be paid in connection with investors' contributions. *Id.* at ¶101. Nothing in the PPM Grossman gave to investors authorized Grossman to receive the investor funds as described above. *Id.* at ¶102.

According to the PPM, Dragon Management can pay broker-dealers finding fees for locating investors. *Id.* at ¶103.  However, Grossman is not a broker-dealer. *Id.* at ¶104. Indeed, FINRA has barred him from working as or associating with any broker-dealer. *Id.*  Moreover, the Defendants did not disclose Grossman's regulatory history with FINRA or with the CFTC to investors. *Id.* at ¶105.

### 3. *Adriana Grossman's Misappropriation of Investor Funds*

From no later than September 2014 until at least June 2016, Adriana Grossman misappropriated at least $293,000 of investor funds for her personal use. *Id.* at ¶106. Approximately $840,000 of investors' funds were deposited into the Dragon Partners and Dragon Management bank accounts, which Adriana Grossman controlled. *Id.* at ¶107.  Adriana Grossman has known her Dragon Partners and Dragon Management bank accounts received

investor funds that Isaac Grossman solicited, and she knowingly spent those funds on personal living expenses instead of investing in Dragon-Click stock. *Id.* at ¶108.

From September 2014 until June 2016, A. Grossman misappropriated $293,000 of investor funds from the Dragon Partners and Dragon Management accounts, as follows:

| Investor Funds Spent For Personal Use | Items and Services Purchased |
|---|---|
| $35,000 | Gambling at a casino |
| $98,000 | Payments for a Chevrolet Corvette and Chevrolet Tahoe |
| $67,000 | Mortgage payments on the Grossman family home |
| $26,000 | Health and car insurance |
| $51,000 | Jewelry, including a 3.8 carat yellow diamond |
| $16,800 | Walmart purchases |

*Id.* at ¶109. The Defendants have not disclosed to investors A. Grossman's misappropriation and misuse of investor funds to pay personal expenses. *Id.* at ¶110. A. Grossman's misappropriation and misuse of investor funds is omitted from the Dragon Partners PPM and other marketing materials. *Id.* at ¶111.

The PPM states that A. Grossman's company, Dragon Management, will receive a 25 percent "Performance-Based Fee" at the end of a Capital Event, as defined in the PPM. *Id.* at ¶112. No Capital Event has ever occurred. *Id.* at ¶113. Accordingly, Dragon Management has never been entitled to receive any Performance-Based Fee. *Id.*

## IV.  MEMORANDUM OF LAW

### A.  Disgorgement and Prejudgment Interest

The Court has ordered the Defendants to pay disgorgement and prejudgment interest in amounts to be determined upon the Commission's motion, and "solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court." (DE 26 at pp.6-7). Thus, the only remaining issues as to disgorgement and prejudgment interest are the amounts the Court should order the Defendants to pay.

The Court has broad discretion in calculating the amount to be disgorged, which "need only be a reasonable approximation of profits causally connected to the violation." *SEC v. Manor Nursing Ctrs*, 458 F.2d 1082, 1103-04 (2nd Cir. 1972) ("Any risk of uncertainty in calculating the disgorgement amount should fall on the wrongdoer whose illegal conduct created that uncertainty.").

"Courts have held that joint-and-several liability is appropriate in securities cases when two or more individuals or entities collaborate or have close relationships in engaging in the illegal conduct." SEC v. Hughes Capital Corp., 124 F.3d 449, 455 (3d Cir.1997). *See also* First Jersey Sec., 101 F.3d at 1475 (holding officer who collaborated in unlawful conduct of firm may be held jointly and severally liable with firm for disgorgement of unlawful gains received); *SEC v. Calvo,* 378 F.3d 1211, 1215 (11th Cir. 2004) ("It is a well settled principle that joint and several liability is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in illegal conduct.").

### 1. *Disgorgement and Prejudgment Interest as to Dragon-Click and Grossman*

As set forth in the Complaint allegations, from no later than September 2014 until present, the Defendants have participated in the offer or sale of securities in the form of Dragon-Click stock and Dragon Partners, LLC ("Dragon Partners") membership interests. (DE 1 at ¶2). The Defendants raised more than $2.4 million from at least 26 investors nationwide, most of them elderly. *Id.* at ¶4. The Defendants raised these funds through a securities offering fraud, by making a series of misrepresentations and omissions about the use of investor funds. *Id.* at ¶¶2-10, 20-113.

Of the $2.4 million raised through the fraudulent offering, approximately $1.6 million of investor funds was deposited into the Dragon-Click bank account Grossman controls. *Id.* at ¶¶ 14 & 98.  Of this $1.6 million, Grossman misappropriated at least $1,019,000 for his personal expenditures, to gamble, to buy jewelry and cars, and to pay his children's school tuition. *Id.* at ¶99.

Accordingly, the Court should order Dragon-Click to disgorge the $1.6 of investor funds it received through the offering fraud, and should hold Grossman jointly and severally liable with Dragon-Click for disgorging $1,019,000 of this amount based on his misappropriation of investor funds from the Dragon-Click account.

As for prejudgment interest on these disgorgement amounts, the Court has ordered that it should be calculated from June 4, 2018, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). (DE 26 at p. 7).  Based on that calculation, as set forth in Composite Exhibit 1 hereto, the Court should order Dragon-Click to pay prejudgment interest of $20,164.38 and Grossman to pay prejudgment interest of $12,842.19.

### 2. *Disgorgement and Prejudgment Interest as to Dragon Management and A. Grossman*

Of the $2.4 million raised through the fraudulent offering, approximately $547,000 of investor funds was deposited into the Dragon Management bank account that A. Grossman controls. *Id.* at ¶ 16.   A. Grossman misappropriated at least $293,000 of the investor funds for her personal expenditures, to gamble, to buy jewelry and pay for cars, and to make mortgage payments on her home. *Id.* at ¶¶106, 109.   Accordingly, the Court should order Dragon Management to disgorge the $547,000 of investor funds it received through the fraud, and should hold A. Grossman jointly and severally liable with Dragon Management for disgorging $293,000 of this amount.

As for prejudgment interest, as set forth in Composite Exhibit 1 hereto, the Court should order Dragon Management to pay prejudgment interest in the amount of $6,893.70 and A. Grossman to pay prejudgment interest in the amount of $3,692.60.

### B. <u>Civil Money Penalties</u>

The Court has ordered the Defendants to pay a civil penalty, and thus the only remaining issue is the amount the Court should order them to pay. (DE 26).

Section 20(d) of the Securities Act of 1933 and Section 21(d)(3) of the Securities Exchange Act of 1934 are virtually identical and establish three tiers of penalties. Under the "First Tier" the court may impose a penalty of up to (i) $5,000 for a natural person or $50,000 for any other person for each violation or (ii) the gross amount of pecuniary gain to a defendant as a result of the violation. Under the "Second Tier" the Court may impose a penalty of up to (i) $50,000 on a natural person or $250,000 for any other person for each violation or (ii) the gross amount of pecuniary gain to a defendant as a result of the violation. The Second Tier applies where the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."

Finally, under the "Third Tier" the Court may impose a penalty of up to (i) $100,000 for a natural person or $500,000 for any other person for each violation or (ii) the gross amount of pecuniary gain to a defendant as a result of the violation.  The Third Tier applies where the requirements of a Second Tier penalty are present and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." The statutory adjustment for inflation increased the penalty amounts for conduct occurring after specific dates.  *See* 17 C.F.R. §201.1005.  Based on when the violations in this case occurred, the

adjusted rate that applies for natural persons is $160,000 for third tier penalties, and $775,000 for companies. *Id.*

The Court has discretion to determine the amount of a penalty "in light of the facts and circumstances" of the securities law violations. 15 U.S.C. §78u-1(a)(2). The facts and circumstances the Court should consider include the defendant's culpability, the amount of profits gained, whether the misconduct was isolated or repetitive, and the need for a deterrent beyond other sanctions the Court has imposed. *SEC v. Ferrero*, No. IP 91 271 C, 1993 WL 625965 at *19 (S.D. Ind. Nov. 15, 1993) (awarding penalty of three times profits gained and losses avoided due to insider trading), *aff'd sub nom. SEC v. Maio*, 51 F.3d 623 (7th Cir. 1995). The Court may also consider the size of the penalty based on: the defendant's net worth (*SEC v. Lipson*, 129 F. Supp. 2d 1148, 1159 (N.D. Ill. 2001), the defendant's demeanor and willingness to admit wrongdoing (*id.*); as well as criminal or other sanctions already imposed for the same misconduct. *Shah*, 1993 WL 288285 at *6 (declining to impose a civil penalty because the defendant was imprisoned and fined in a criminal proceeding for the illegal acts).

### 1. The Defendants' Violations Involved Fraud and Deceit, and Resulted in Substantial Losses to Investors

The Court should impose a one-time, statutory third-tier civil penalty against each of the Defendants pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act. Third tier penalties apply because the Defendants' violations involved fraud, deceit, and manipulation, and resulted in substantial losses to investors. As set forth in the Complaint allegations, which are deemed true for purposes of calculating the civil penalty amounts, from no later than September 2014 until June 2018, the Defendants participated in the offer or sale of securities in the form of Dragon-Click stock and Dragon Partners membership interests. (DE 1 at ¶2). Grossman, directly and through Dragon-Click, lured investors through a series of misrepresentations and omissions. *Id.* at ¶¶20-97. As set forth in the Complaint, Grossman, directly and through Dragon-Click, told investors Dragon-Click would use investor funds to develop the Dragon-Click Application and to pay patent attorneys. This was false, as Grossman has been spending investor funds for his personal expenditures, and spent only about $36,000 of the $2.4 million raised (or about 1.5% of the investor funds) to pay patent attorneys. Additionally, Grossman and Dragon-Click falsely told investors that they would make huge returns on their investment in Dragon-Click stock. There was no reasonable basis for making

this representation because at the same time Grossman was making this promise to investors, he was spending the majority of investor funds on his personal expenditures.

A. Grossman and her company Dragon Management obtained investor money by means of these material misrepresentations to investors, and through the misrepresentation in the PPM about the use of proceeds.  A. Grossman signed the Subscription Agreements, which refer to the PPM and its representations that investor funds would be used to develop the Dragon-Click Application. This same PPM assured investors that A. Grossman would manage and oversee the operations for the benefit of investors.  However, she knowingly misappropriated a substantial portion of the investor funds, rather than utilize them as represented to investors. For example, the PPM tells investors that investor funds will be used by Dragon Management to purchase Dragon-Click stock.  Rather than using the investor funds to purchase the stock, A. Grossman used the investor funds for herself.  Grossman and the Dragon Management PPM both omitted to tell investors about payments for personal expenses and Grossman and A. Grossman's misappropriation of investor funds, thus rendering representations about the use of investor funds misleading.

Grossman and A. Grossman committed numerous deceptive acts.  As set forth above, they misappropriated more than $1.3 million of investor funds for themselves.  These actions are in violation of the use of funds representations in the PPM and Grossman and Dragon-Click's oral representations to investors.  Grossman made the fraud possible by soliciting investors, approving the PPM for distribution to investors, and distributing it.  Similarly, A. Grossman was a critical part of the scheme because she signed the investors' Subscription Agreements and, as set forth in the PPM, was the person entrusted with using investor funds to purchase shares of Dragon-Click stock.  Instead, she spent investor funds for cars, diamonds, and gambling.

All of these actions constitute manipulative or deceptive acts that are part of the fraudulent and deceptive course of conduct charged in this case.  Because Grossman's actions can be imputed to Dragon-Click and A. Grossman's actions can be imputed to Dragon Management, the companies along with Grossman and A. Grossman are responsible for engaging in a deceptive scheme.

The Defendants' conduct resulted in substantial investor losses. Through the offering fraud Defendants raised more than $2.4 million from investors, and then Grossman and A. Grossman, through their companies Dragon-Click and Dragon Management, misappropriated

more than half of these investor funds to gamble, buy jewelry, and pay their mortgage, car payments, and children's school tuition payments. *Id.* at ¶¶9, 98-113.  Investors lost their investment funds.  Of the $2.4 million raised, the Defendants returned only $53,000. *Id.* at ¶39.

### 2. Egregiousness and Scienter

Courts have defined scienter as a state of mind embracing intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  The Eleventh Circuit has concluded that scienter may be established by a showing of knowing misconduct or severe recklessness. *Carriba Air*, 681 F.2d at 1324.

The evidence establishes the Defendants have acted knowingly, or at a minimum recklessly.  Isaac and Adriana Grossman knowingly and intentionally misappropriated investor funds by not spending them as was represented to investors.  Grossman promised investors huge returns while knowing that he was using their money primarily for personal expenses and not to help build a business that might have been able to make the promised returns.  Grossman told investors, both orally and in the PPM, that he would use their funds to develop the Dragon-Click Application and pay patent attorneys, and then spent the investors' funds on cars, diamonds, and gambling.  A. Grossman signed the investors' Subscription Agreements which reference the PPM, which promised investors their money would be used to buy Dragon-Click stock and assured them that A. Grossman would manage and oversee the business.  She then nonetheless misappropriated investor funds for her personal expenditures rather than as represented in the PPM.  The Grossmans did not even have a personal bank account during the fraudulent scheme.  Instead, they used the Dragon-Click and Dragon Management bank accounts they controlled for all of their personal expenditures and to fund their gambling habits.

Dragon-Click and Dragon Management also acted with scienter because Grossman's conduct is imputed to Dragon-Click and A. Grossman's conduct is imputed to Dragon Management. *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999) (the scienter of corporate officers is properly imputed to the corporation).

The allegations against the Defendants, deemed as true for purposes of this motion, reflect the highest degree of scienter and culpability.

### 3. Profits

As discussed above, the Defendants raised $2.4 million from investors through the three unregistered, fraudulent US Energy offerings.  Of this amount, Dragon-Click took $1.6 million

and Grossman took $1.019,000 of that amount.   Dragon Management took $547,000 of the investor funds, and A. Grossman took $293,000 of that amount.   At the end of the day, the Defendants kept or spent all of the investors' money, returning only $53,000 of the $2.4 million raised.

### *4. Isolated vs. Recurrent*

The Defendants' conduct was not isolated.  Instead, it spanned years.  *Id.* at ¶2.  It did not end until the Commission filed this action and froze the Defendants' assets. Over the course of years, the Defendants raised money from at least 26 mostly elderly investors nationwide, with Grossman and Dragon-Click repeatedly soliciting and lying to investors over the course of years. *Id.* at ¶¶59-97.  Grossman misappropriated at least $1,019,000 of the investor funds, and did so over the course of years. *Id.* at ¶99.  Similarly, A. Grossman misappropriated at least $293,000 of the investor funds over the course of years. *Id.* at ¶109.  There was nothing isolated about this fraudulent scheme.

### *5. Willingness to Admit Wrongdoing and Criminal Sanctions.*

The Defendants entered the Consents in this case without admitting or denying the Complaint allegations.  Nor have any criminal sanctions been imposed against the Defendants based on his conduct in this case.   While Grossman has stated to staff he should not have engaged in the fraudulent conduct, the Court should not impose a lower penalty.  Grossman has a history of engaging in illegal conduct in connection with investment offerings. He previously consented to an Order, without admitting or denying liability, finding that he and his company, London Metals, engaged in illegal, off-exchange, precious metals transactions. *Id.* at ¶12.  The CFTC Order, entered September 4, 2013, directed Grossman and London Metals to pay $121,665.75 in restitution to their customers, imposed permanent registration and trading bans on Grossman, and required him to cease and desist from violating the Commodity Exchange Act. *Id.* However, neither Grossman nor London Metals has paid the restitution the CFTC ordered. Instead, Grossman engaged in the Dragon-Click securities fraud and misappropriated investor funds.

### *6.  Net Worth of the Individual Defendants*

We do not have an understanding of the Grossmans' current net worth, but believe they do not have the ability to pay a large penalty.   While the remaining penalty factors discussed above support seeking a higher penalty equal to the total amount the Grossman's

misappropriated from investors, the Commission believes that in light of our understanding that the Grossmans have a lower net worth, we are seeking a lower statutory penalty of $160,000 against each of them.

## V.  CONCLUSION

For the foregoing reasons, the Court should impose disgorgement, prejudgment interest, and civil penalties against each Defendant, as follows: (1) as to Isaac Grossman: disgorgement of $1,019,000, prejudgment interest of $12,842.19, and a civil penalty of $160,000; (2) as to Adriana Grossman: disgorgement of $293,000, prejudgment interest of $3,692.60, and a civil penalty of $160,000; (3) as to Defendant Dragon-Click: disgorgement of $1.6 million, prejudgment interest of $20,164.38, and a civil penalty of $775,000; and (4) as to Defendant Dragon Management: $547,000, prejudgment interest of $6,893.70, and a civil penalty of $775,000.

October 18, 2018                    Respectfully submitted,


By:      s/Amie Riggle Berlin
         Amie Riggle Berlin
         Senior Trial Counsel
         Florida Bar No. 630020
         Direct Dial: (305) 982-6322
         Direct email: berlina@sec.gov

         Attorney for Plaintiff
         **SECURITIES AND EXCHANGE   COMMISSION**
         801 Brickell Avenue, Suite 1800
         Miami, Florida  33131
         Telephone: (305) 982-6300
         Facsimile:   (305) 536-4154

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CCERTIFY that on October 18, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that I have caused the foregoing document to be served this day on all parties identified on the below Service List in the manner specified.

<u>s/Amie Riggle Berlin</u>
Amie Riggle Berlin, Esq.

SERVICE LIST

Isaac Grossman
11883 NW 79th Court
Parkland, FL 33076
Pro Se
Via UPS

Dragon-Click Corp.
c/o Isaac Grossman, Registered Agent
11883 NW 79th Court
Parkland, FL 33076
Pro Se
Via UPS

Dragon Management LLC
c/o Adriana Grossman, Registered Agent
11883 NW 79th Court
Parkland, FL 33076
Pro Se
Via UPS

Adriana Grossman
11883 NW 79th Court
Parkland, FL 33076
Pro Se
Via UPS